| UNITED STATES DISTRICT COURT | FOR ONLINE |
| EASTERN DISTRICT OF NEW YORK | PUBLICATION ONLY |

------------------------------------X

GELENE BADEAU,

        Plaintiff,                         MEMORANDUM
                                                   AND ORDER
    - against -                         06-CV-4574 (JG)

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

------------------------------------X

APPEARANCES:

    HAROLD SKOVRONSKY
        1810 Avenue N
        Brooklyn, NY 11230
        Attorney for Plaintiff

    ROSLYNN R. MAUSKOPF
        United States Attorney
        One Pierrepont Plaza
        Brooklyn, NY 11201
    By:    Zachary Cunha
        Assistant U.S. Attorney

JOHN GLEESON, United States District Judge:

        Plaintiff Gelene Badeau brings this action against the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking review of the denial of her application for disability insurance and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act (hereinafter "the Act"). At issue is whether Badeau is "disabled" within the meaning of the Act. The government argues that the Commissioner correctly applied the relevant regulations to determine that Badeau is not disabled, and moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Badeau argues that the record does

not support a finding that she can work.  She seeks a ruling that she is disabled, and cross-moves for remand solely for the calculation of benefits.  For the reasons stated below, both motions are denied, and the case is remanded for further administrative proceedings.

BACKGROUND

On November 20, 2000, Badeau was working as a nurse's aid at Lennox Hill Hospital.  She was 37 years old at the time, and had performed the job for nine years.  In order to retrieve a meal tray, Badeau entered the room of a patient who had recently given birth.  While Badeau was in the room, the patient attempted to rise from the bed.  Badeau noticed the patient losing her balance, and quickly dropped the tray so she could prevent the patient from falling.  The patient lost consciousness, and though the patient was larger than Badeau, Badeau was able to prevent her from falling to the ground.  Badeau could not move the patient to the bed without assistance though, and continued to try to hold her off the ground.  Badeau eventually fell to the floor, however, and the patient fell on top of her.  After other employees arrived, Badeau took herself to the hospital's Emergency Room.  She underwent an examination and received pain medication.  Because of chronic pain in her left shoulder, neck and lower back caused by the incident, Badeau has not been employed since that time.

On December 1, 2000, Badeau visited Dr. Fritzner Bourdeau, a physical rehabilitation specialist who would become her treating physician.  She complained of pain, tingling sensations, numbness and stiffness in her neck, left shoulder, left arm, and lower back. *See* R. 132-36 (Dec. 2000 Bourdeau Report).  Badeau's condition made it painful for her to lift, bend, change positions, stand, walk, and ride.  *Id.*  Badeau had an antalgic gait, *i.e.*, she walked with a limp to avoid painful pressure on certain body parts.  *Id.*  Her range of motion was limited

2

in her left shoulder, and in the cervical and lumbar regions. *Id.* While she could conduct straight leg raises on the right side up to sixty degrees, her left side leg raises reached only twenty degrees. *Id.* Tests indicated the presence of spinal compression, nerve root lesion, and disc lesion in the lumbar spine, among other pathologies. *Id.* Bourdeau's diagnosis included cervical radiculopathy at C5-C6, lumbar radiculopathy at L4-S1, and exacerbation of cervical and lumbar spinal injuries. *Id.* He concluded that Badeau was "totally disabled until further notice." *Id.* Badeau saw Dr. Bourdeau three times a week for physical therapy after her initial visit.

Several other doctors conducted consultative examinations of Badeau in association with a Worker's Compensation suit that she filed. First, Badeau saw Dr. Jean Robert Desrouleaux, a neurologist, on February 22, 2001. Desrouleaux found that Badeau could raise her straightened left leg forty degrees, and found a decrease of sensation in her left arm and leg. *See* R. 127-28 (Desrouleaux Report). Badeau was still limping during her visit to Desrouleaux. He diagnosed cervical radiculitis, likely at C5-C6, left lumbar radiculitis, and left shoulder injury. *Id.* He concluded that the events of November 30, 2000 caused the above conditions. *Id.*

Badeau next saw Dr. Andrew Weiss, an orthopedic surgeon, on April 24, 2001. Unlike Dr. Bourdeau, Dr. Weiss found no limitation of movement in Badeau's left shoulder, cervical, or lumbar regions. *See* R. 285-88 (April 2001 Weiss Report). Weiss concluded that any sprain to the cervical and lumbosacral spine caused by the November 30 accident was "resolved by objective clinical criteria at the time of the examination." *Id.* He also concluded that Badeau was not disabled for the purposes of her job as a nurse's assistant, and that she could return to work without restrictions. *Id.*

Dr. Weiss again examined Badeau on August 14, 2001. His second report referred to earlier reports submitted by Dr. Bourdeau and Dr. Desrouleaux (spelled "Zesouleaus" by Weiss in his report), and he once again concluded that there was no limitation of movement in Badeau's left shoulder, cervical, or lumbar regions. *See* R. 252-53 (Aug. 2001 Weiss Report).

On December 5, 2001, Badeau underwent needle electromyography ("EMG") as well as magnetic resonance imaging ("MRI") testing. The EMG revealed medial neuropathy below the left shoulder and lumbosacral radiculopathy at L4, L5, and S1, consistent with Dr. Bourdeau's diagnosis shortly after the accident. R. 129-30. An MRI of the lumbosacral spine showed: (1) herniated discs at L4-L5 and L5-S1 to the right and centrally; (2) a bulging disc at L3-L4; (3) narrowed neural foramina levels at L4-S1; and (4) "exaggerated lumbar lordosis suggesting muscular and/or ligamentous laxity, and rotary scoliosis convex to the left." R. 125. An MRI of the left shoulder revealed: (1) split thickness tears or tendinosis supraspinatus located in the long head of the biceps and infraspinatus tendons; (2) a defect in the posterior glenoid, irregular posterior labrum, and posterior Bankart lesion; (3) a subacromial spur in the acromioclavicular joint; (4) effusion in the glenohumeral joint extending into the subdeltoid and subscapularis bursae and into the biceps tendon sheath. R. 126.

In a February 4, 2002 report to the Worker's Compensation Board, Dr. Bourdeau recommended physical therapy twice weekly for three to six months and follow-up care to address lumbosacral herniations and left shoulder derangement. *See* R. 228 (Feb. 2002 Bourdeau Report).

An examination conducted by Dr. Bourdeau on March 26, 2002 revealed continued left shoulder pain and lower back pain and stiffness, as well as reduced range of

motion. *See* R. 214 (April 2002 Bourdeau Report). Badeau could raise her straightened leg fifty-five degrees on the left and sixty degrees on the right. *Id.* On April 23, 2002, Bourdeau recommended to the Worker's Compensation Board that Badeau receive weekly physical therapy and follow-up care. R. 213-15.

On April 25, 2002 Dr. Kenneth Falvo conducted a consultative exam in connection with the Worker's Compensation claim. Falvo indicated that he was familiar with the examinations and testing that had already taken place, including the MRI and EMG testing. *See* R. 205-09 (Falvo Report). In his own physical examination, Falvo found Badeau to have a normal gait, normal range of motion in the shoulders, good grip strength in both hands, and normal sensation and reflexes in the lower extremities. *Id.* He found that she had L4 vertebral tenderness. *Id.* Falvo concluded that Badeau's lower back sprain had become resolved, and that Badeau suffered no disability that would prevent her from returning to her position as a nurse's aide. *Id.*

On August 8, 2002, Badeau filed for Disability Insurance Benefits and Supplemental Security Income payments, the denial of which gives rise to this appeal. To aid the Commissioner in the determination of benefits, Dr. Bourdeau submitted a medical report on September 12, 2002 summarizing his treatment of Badeau. R. 137-43 (Sept. 2002 Bourdeau Report). He stated that he saw Badeau once a week for physical therapy, and that she suffered from a reduced range of motion in her lumbar region and left shoulder as well as tenderness of the lumbosacral spine. *Id.* He also reported the results of the MRI and EMG testing, including herniations within the lumbar and cervical areas of the spine and left shoulder derangement. *Id.* Bourdeau concluded in his report that Badeau was limited to carrying five to ten pounds on the

5

right, and five pounds on the left. He found that she was limited to walking or standing for less than two hours during an eight hour workday and to sitting for less than six hours during the day. *Id.*

On November 5, 2002, Dr. Mohammad Khattak conducted an additional consultative examination. Khattak reported a steady gait, normal range of motion in the shoulders and hips, normal hand grip, and no muscle atrophy. *See* R. 144-45 (Khattak Report). He noted that the MRI showed degenerative disc disease and a tear in the rotator cuff, but did not specifically comment on the herniated discs. *Id.* Khattak concluded that Badeau may have had a limited ability to bend and lift, but she had an unlimited ability to sit, stand, walk, and reach with both gross and fine hand manipulations, and did not require assistance to walk. *Id.*

The settlement of Badeau's Worker's Compensation claim resulted in Badeau's June 2003 loss of access to funds to pay for her regular visits to Dr. Bourdeau. *See* R. 460. After that time, she saw him only when it was necessary to renew her prescriptions.[1]

On December 25, 2002, Badeau's Social Security Act claim was denied and she sought a hearing. It took the agency 21 months -- until October 20, 2004 -- to give her one. In the meantime, Badeau and her three teenage children had been evicted from their home for nonpayment of rent, and were living with Badeau's sister and others. *See* R. 450-52.

Prior to the October 2004 hearing, Badeau was examined again by Dr. Bourdeau. Bourdeau's report, dated September 24, 2004, cited the herniated discs with radiculopathy and the shoulder derangement to support the conclusion that Badeau was (1) unable to lift or carry

---

[1] Badeau did not receive regular treatment again until she began seeing physical rehabilitation specialist Dr. Christine Hinke -- Badeau's second treating physician for the purposes of this case -- at the Kingsbrook Jewish Medical Center once a month beginning in the fall of 2005.

more than five pounds; (2) unable to walk for more than one hour in an eight-hour workday; and (3) unable to sit for more than one hour without standing for a period of time to relieve discomfort. *See* R. 376-78 (Sept. 2004 Bourdeau Report).

At the hearing before Administrative Law Judge ("ALJ") Harold Rosenbaum, Badeau, who was represented by counsel, testified about her background, work history, experience of pain since the accident, and level of activity since the accident. *See* Oct. 2004 Tr. The ALJ's December 15, 2004 decision rejected Badeau's claim, reasoning that Badeau was not disabled for the purposes of the Act. R. 38-47 (December 2004 ALJ Decision). The ALJ discussed Dr. Bourdeau's September 2002 report, and found Badeau's impairments to be "severe," but not of the nature that would lead to a presumption of disability according to the applicable regulations. *Id.* Finally, although the ALJ concluded that Badeau could not return to her past relevant work as a nurse's aide, he found that she had the residual functional capacity to perform a significant range of sedentary work, and thus was not disabled within the meaning of the law.

On review, the Appeals Council, in a decision dated June 16, 2005, vacated the ALJ's decision and remanded the case for further administrative proceedings. *See* R. 34-37 (Appeals Council Remand). The Appeals Council cited inadequate evaluation of Dr. Bourdeau's September 2002 and September 2004 reports in the ALJ's decision, and directed the ALJ to further consider Badeau's ability to work. *Id.* The Appeals Council also instructed the ALJ to "take any further action needed to complete the administrative record," and, "if warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." *Id.*

On September 9, 2005, Dr. Kyung Seo examined Badeau. Dr. Seo found no significant weaknesses in the left shoulder, arm, or leg, and no sensory defects. R. 411-16 (Seo Report). He concluded that Badeau likely suffered from mild scoliosis, and that her back aches limited her movements slightly. *Id.* Seo determined that Badeau could lift up to twenty pounds occasionally and up to 10 pounds frequently. He also concluded that she could stand or walk for six hours during an eight hour day, and sit for six hours. *Id.*

On December 7, 2005, ALJ Rosenbaum presided over a second hearing. That same day, Dr. Christine Hinke examined Badeau. On December 21, 2005, she filled out a form entitled "Medical Assessment of Ability to Do Work-Related Activities," and checked the spaces on the form indicating that Badeau could occasionally lift a maximum of ten pounds, and could frequently lift less than ten pounds. *See* R. 421-23 (Hinke Report). She also determined that Badeau could stand or walk for less than two hours during an eight hour work day. Hinke did not indicate how many hours a day Badeau could sit; she did not check off the option "less than six hours," nor did she check "about six hours." *Id.* Instead, Hinke noted that Badeau would need to frequently change positions between sitting and standing in order to prevent the development of muscle spasms. *Id.* According to Hinke, maintaining prolonged posture was not possible. *Id.*

In a decision dated February 22, 2006, the ALJ again determined that Badeau was not disabled for the purposes of the Act at any time since her accident. The ALJ found that Badeau was unable to return to work as a nurse's aide, but she had the ability to perform a significant number of sedentary jobs in the national economy, so she was not disabled. R. 21-22.

On July 24, 2006, the Appeals Council denied Badeau's request for review, making the administrative decision final. This timely appeal followed.

DISCUSSION

A.     The Standard of Review

When ruling on an appeal from an administrative denial of disability benefits, a court first determines "whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999). "Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Id.* at 773. *See also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shaw*, 221 F.3d at 131 (citations omitted).

The legal standard to determine whether a person is "disabled" within the meaning of the Social Security Act, 20 C.F.R. § 404.1520, involves the following five-step inquiry:

> (1)  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity;
>
> (2)  If not, the Commissioner considers whether the claimant has a "severe impairment" which meets the durational requirement and which limits his or her mental or physical capacity to do basic work activities.
>
> (3)  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled.

(4) If the impairment is not listed in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.[2]

(5) If the claimant is unable to perform his or her past work, the Commissioner then considers the claimant's residual functional capacity -- and his or her vocational capacity, *i.e.*, age, education, and work experience -- to determine whether the claimant can adjust to other work. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*See Shaw*, 221 F.3d at 132; *see also Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

In assessing a claim of disability pursuant to the above test, an ALJ must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam). With respect to the second factor, the regulations contain a "treating physician rule" which requires the ALJ to give "controlling weight" to the medical opinion of a treating physician, provided "it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw*, 221 F.3d at 134; *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998).

In order to implement the treating physician rule, an ALJ is required to "affirmatively develop the record," even if the plaintiff is represented by counsel. *Tejada v.*

---

[2] Residual functional capacity is defined as follows: "Your impairments(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations." 20 C.F.R. § 416.945(a).

*Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *see also Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete.").

   B. <u>The ALJ's February 2006 Decision</u>

The ALJ found that Badeau is not performing substantial work activity, and that she suffers from a "severe" impairment. R. 17. The ALJ next concluded, pursuant to step three of the test, that Badeau failed to establish she suffers from one of the impairments listed in Appendix 1 of 20 C.F.R. 404 Subpart P. *See* R. 17-18. The ALJ's examination of Badeau's residual functional capacity led him to conclude that she cannot perform her past relevant work as a nurse's aid. *See* R. 21.

Finally, the ALJ reached step five of the above standard. According to the ALJ, Badeau

> probably would have difficulty standing or walking more than 1 to 2 hours in an 8-hour day, lifting or carrying more than 10 pounds occasionally, and sitting for extensively long periods of time without changing position, although she clearly remains capable of sitting at least 6 hours in an 8-hour day, and could satisfy any need she has to alternate positions during scheduled breaks and a lunch period at two hour intervals.

R. 20. Accordingly, the ALJ found that Badeau is not disabled since she can perform a significant range of other sedentary work. R. 21-22.[3]

---

[3] In sedentary employment "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." S.S.R. 83-10; *see also* 20 C.F.R. § 404.1567(a).

11

1.  *The Factors Cited by the ALJ*

The ALJ found it "is not established by objective, clinical, laboratory, or diagnostic test findings," that Badeau's impairments have met the level of severity contemplated by any impairment in Appendix 1, and that "no treating source or other examiner has expressed an opinion as to whether the claimant's impairments either meet or medically equal the requirements of any Listed impairment . . . ." R. 17.

The ALJ also found that the objective medical evidence did not reveal a residual functional capacity resulting in disability because (1) Bourdeau did not indicate in his September 2002 and September 2004 reports "whether the claimant continued to present with the sensory and motor deficits appreciated by Drs. Bourdeau and Desrouleaux in December 2000 and February 2001, respectively." R. 18; (2) "no other examiner since February 2001 . . . appreciated any sensory, reflex, or motor deficits whatsoever," suggesting that "whatever injuries to the cervical and lumbosacral spine the claimant may have sustained in November 2000 had resolved by April 2001 . . . ." R. 18; (3) there is a lack of proof that "the abnormalities shown on the MRI's and electrodiagnostic testing done in December 2001 did not result from [Badeau's] prior injuries in 1997 and 1998." R. 19 (noted as "significant" because "the claimant returned to work and continued working following those injuries with no reported difficulties"); (4) "[n]o additional diagnostic tests have been performed or recommended, nor is it indicated that Dr. Bourdeau or any other physician has recommended surgery." R. 19.

Badeau's testimony about her pain was not credible, in the ALJ's view, because (1) it was "unsupported by the objective evidence . . . ." T. 19; (2) "[n]o hospitalizations or emergency room visits for treatment or evaluation of back, neck, or shoulder pain are

12

documented in the record, nor is it indicated that surgical intervention has been recommended," and "no treatment from June 2003 through the fall of 2005 . . . is documented in the record or alleged." T. 19; and (3) the record lacks "independent evidence documenting that her activities of daily living have been, or currently are, significantly limited by pain," that strong painkillers have been prescribed, or that Badeau experiences symptoms of depression "that are typically associated with an individual suffering from severe, intractable pain of longstanding duration." T. 19. The ALJ concluded that "the overall thrust of the medical and non-medical evidence before me is not consistent with an individual suffering from pain as persistently overwhelming or debilitating as she has portrayed it as being." R. 20.

Furthermore, consideration of the medical opinions, including those of treating physicians Bourdeau and Hinke, did not indicate to the ALJ that Badeau suffers from a disability since the "extreme functional limitations" Bourdeau described in his 2004 report were "inconsistent the doctor's own largely subjective and uncorroborated findings on examination," and were "unduly influenced by the claimant's somewhat exaggerated complaints and alleged functional limitations." T. 20. The ALJ concluded that Bourdeau's assessments reflect an "uncritical acceptance" of Badeau's portrayals of her pain, so "need not be, and have not been, afforded controlling, or even great weight in evaluating her claim." R. 20. However, the ALJ stated that Dr. Hinke's report had been "essentially adopted." R. 21.

Finally, at the time of the hearing, Badeau was a 43 year-old woman (defined as a "younger individual" by 20 C.F.R. § 404.1563) with two years of college. In combination with her residual functional capacity, the ALJ concluded that these characteristics supported a decision that Badeau is not disabled. R. 21.

13

2. *Appendix 1*

Badeau first argues that she suffers from one of the impairments listed in Appendix 1 of 20 C.F.R. 404 Subpart P. *See* Pl.'s Br. 4-5. Section 1.04(A) of the Listing describes one of several disabilities of the spine as the following: "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 1.04(A).

Though the ALJ concluded that Badeau's inclusion within the Listing "is not established by objective clinical, laboratory, or diagnostic test findings," R. 17, Badeau argues that the medical findings in the record place her "squarely within the ambit" of § 1.04(A). Pl.'s Br. 5. The record includes evidence of reduced motion of the spine, as well as sensory reflex loss and impairment reflected in straight-leg raising tests, all of which are inconsistent with the ALJ's findings with respect to Appendix 1. *See* December 2000 Bourdeau Report; Desrouleaux Report; R. 129-30, 125 (EMG and MRI Reports); April 2002 Bourdeau Report; Sept. 2002 Bourdeau Report).

There is certainly contrary evidence in the record, perhaps enough to sustain the Commissioner's finding, but I conclude that the record is insufficiently developed for decision at this time. As noted above, the ALJ was under an affirmative duty to adequately develop the medical record, particularly with regard to any treating physician. Indeed, the regulations inform potential claimants, "[w]hen the evidence we receive from your treating physician or psychologist . . . is inadequate for us to determine whether you are disabled, . . . [w]e will first

recontact your treating physician or psychologist . . . to determine whether the additional information we need is readily available." 20 C.F.R. § 416.912(e); *see also Pabon v. Barnhart*, 273 F. Supp. 2d 506, 517 (S.D.N.Y. 2003) (in light of the duty to develop the record, the ALJ erred in failing to contact a treating physician to obtain more information); *Devora v. Barnhart*, 205 F. Supp. 2d 164, 174 (S.D.N.Y. 2002) ("There is ample case law suggesting that an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing.").

The ALJ began his decision[4] with the observation that Badeau testified she had been receiving weekly treatment from Dr. Hinke for four months prior to the December 7, 2005 hearing. *See* R. 16. But the decision reeks of skepticism of that claim. *See* R.19 (observing that there was no record of "treatment from June 2003 through the fall of 2005, when the claimant *allegedly* came under the care of Dr. Hinke") (emphasis added); *id*. (referring again to Bandeau's "first *alleged*, *but undocumented* visit to Dr. Hinke" in the fall of 2005) (emphasis added). The ALJ clearly doubted the truthfulness of Badeau's testimony, and his doubts were just as clearly not dispelled by the post-hearing, pre-decision submission by Hinke stating a "date last seen" of December 7, 2005.

The ALJ failed to properly develop the record regarding Hinke's (a) treatment history of Badeau and (b) opinions regarding Badeau's residual functional capacity. If the ALJ thought Badeau might have been fabricating four months worth of visits to Hinke, the ALJ should have asked Hinke. And while he was at it, the ALJ should have asked Hinke to weigh in

---

[4] The copy of the ALJ's decision in the record before me does not bear a date, but the index to the record sets the date as February 22, 2006.

15

more usefully regarding Badeau's residual functional capacity than Hinke did in the only assessment by her in the record -- the incomplete December 21, 2005 report at R. 421-23. The ALJ should not have concluded that Badeau "clearly remains capable of sitting at least 6 hours in an 8-hour day," R. 20, when her most recent (and then-current) treating physician, in response to that precise question, indicated otherwise.[5]  R. 422.

As for the listed impairment issue, on remand the Commissioner should obtain a full diagnostic report from Hinke and specifically inquire of her whether, in her view, Badeau's impairment fits within Subpart P, App. 1, §1.04(A). Once the record is properly developed, the treating physicians rule must then be properly applied to Hinke's opinions.

3.  *Residual Functional Capacity*

　　i.　　The Treating Physician Rule

I have noted that the ALJ fell short of the duty to develop the record with regard to the work of Dr. Hinke, especially in light of the treating physician rule. The ALJ also failed to satisfy the treating physician rule with respect to Dr. Bourdeau.

When the ALJ does not accord controlling weight to the opinions of a treating physician, he or she must say so, and must also state what weight, if any, those opinions have received and the reasons for that determination. *Clark v. Cmm'r of Soc. Sec.*, 143 F.3d at 118 (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)). The failure to do so is a ground for remand. *Schaal*, 134 F.3d at 503-04. In determining the (non-controlling) level of deference given a treating source, the ALJ must consider (i) the frequency of examination and the length, nature,

---

[5]　　As discussed above, asked whether Badeau could sit, with "normal breaks," for "about six hours" or "less than six hours" in an eight-hour workday, Hinke checked *neither* box, opining instead that Badeau must frequently change her position to prevent pain from muscle spasms. R. 422.

and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran*, 362 F.3d at 32.

In this case, the ALJ found Bourdeau's September 2002 and September 2004 assessments to have been "unduly influenced by the complainant's somewhat exaggerated complaints," and not entitled to controlling, "or even great," weight. R. 20. Indeed, the sole basis for limiting the weight accorded Bourdeau's assessments appears to be Bourdeau's "uncritical acceptance" of the claimant's allegations regarding her symptoms, which themselves lacked credibility, according to the ALJ. *Id.* The ALJ's decision does not devote adequate attention to the factors the regulation says must be considered in determining what weight to accord a treating physician's opinion. Furthermore, the ALJ does not state what weight Bourdeau's earlier assessments -- particularly the December 2000 assessment -- were entitled to for the purposes of the residual functional capacity analysis. These deficiencies must be remedied on remand.

    ii.    <u>Other Errors</u>

Several of the ALJ's findings cannot be reconciled with the record. First, Dr. Hinke's report, which the ALJ claims to have "essentially adopted," *see* R. 21, is inconsistent with the ALJ's findings. As discussed above, Hinke did not opine that Badeau could sit for "almost six hours" or even "less than six hours" per workday, but instead stated that Badeau must frequently change her position to prevent muscle spasms. R. 422. The ALJ's conclusion

17

that Badeau "clearly remains capable of sitting at least 6 hours in an 8-hour day," *see* R. 20, 22, is thus at best not supported by Hinke's assessment, and at worst contradicted by it.

The ALJ also twice stated Badeau had not indicated that Dr. Bourdeau or any other physician had recommended surgery, basing his credibility determination in part upon this finding. *See* R. 19 ("nor is it indicated that surgical intervention has been recommended"); *id*. ("nor is it indicated that Dr. Bourdeau or any other physician has recommended surgery"). However, during the hearing held on October 20, 2004, when the ALJ asked Badeau if Bourdeau had ever recommended surgery, she replied in the affirmative. R. 460. According to Badeau, Bourdeau "told me I needed surgery for my back," and referred her to a neurosurgeon (presumably Desrouleaux). *Id*. Badeau learned from the neurosurgeon that there was only a 34% chance that surgery would improve her condition, and so she decided against it. *Id.*

The ALJ also found Badeau's credibility to be undermined by the fact that she had not alleged extensive treatment or hospital visits between June 2003 and the fall of 2005. But Badeau explained at the hearing that she no longer had worker's compensation coverage for treatment after approximately June 2003, R. 460; that Medicaid does not cover much of the treatment she may have needed, including surgery, R. 467, 470; and that she did not have the money to pay for the cost of treatment. R. 458. The rest of Badeau's financial picture tended to confirm that testimony; she and her three children (ages 18, 17 and 14) had been evicted from their apartment in July 2004 and were staying in other peoples' homes. R. 449-51. Yet, in somewhat cynical fashion, the ALJ observed that Badeau's treatment and therapy "coincidently (?) (sic) seemed to stop in June 2003 right after her workers' compensation claim was settled." R. 19. The obvious implication is that Badeau stopped receiving treatment and therapy because

18

she did not really need it.  If the ALJ reaches that determination again on remand, he must at least

address Badeau's well-supported claim that she simply could not afford it.[6]

Finally, the ALJ found it "significant" that Badeau had "not documented" that the

physical abnormalities shown by her December 2001 MRIs and electrodiagnostic testing "did not

result from her prior injuries in 1997 and 1998."  R. 19.  The significance, according to the ALJ,

lies in the fact that Badeau "returned to work" following those injuries.  *Id*.  Therefore (this much

is left for the reader to imply), by not "documenting" that she did *not* have bulging and herniated

discs before she saved the patient from falling in November 2000, Badeau had not demonstrated

that she was not lying about the effects of that event.

This was error.  The issue before the ALJ was whether Badeau was disabled, not

whether her condition was caused more (or exclusively) by a recent (and undisputed) event than

by events in the past.  Given the factual difficulties such an inquiry poses, not to mention the fact

a recent event could exacerbate preexisting injuries, causing disability, an ALJ's causation

speculation scarcely seems useful to an assessment of a claimant's credibility.  But if an ALJ

concludes otherwise, the burden may not properly be placed on the claimant to prove the

negative (*i.e.*, that she not only has disabling abnormalities now, but she did not have them

before she stopped working) under the guise of assessing credibility.  Put another way, if the ALJ

thought it important to determine whether Badeau had herniated and bulging discs as early as

1997 or 1998, he should have found out himself.  Ascribing significance to Badeau's failure to

---

[6] At the first hearing, though not in his opinion, the ALJ evidenced a belief that Badeau's settlement of her workers' compensation claim in June 2003 rendered suspect her claim of financial distress.  But Badeau had been borrowing from others since late 2000, when she stopped working, to pay her family's expenses, and she testified that those debts were repaid from the proceeds of the settlement.  R. 451.

prove nondisability prior to saving the patient from falling in November 2000 was unwarranted and unfair.

CONCLUSION

For the foregoing reasons, the case is remanded for further proceedings and for a new determination of (1) Badeau's possible disability pursuant to Appendix 1 of 20 C.F.R. 404, Subpart P for some or all of the period between November 30, 2000 and the present; (2) Badeau's residual functional capacity to obtain other work for some or all of the period between November 30, 2000 and the present.

The Commissioner is directed to obtain a complete diagnostic report from Dr. Hinke and any subsequent treating physician. Such reports and assessments of treating physicians, including those of Dr. Bourdeau, shall be evaluated in accordance with the treating physician rule. In the event that a treating physician's opinion is not given controlling weight, the Commissioner will articulate what weight, if any, is given to the opinion by reference to the factors listed in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The issue of the credibility of the claimant shall be revisited in a manner consistent with this opinion. Finally, the Commissioner should also obtain evidence from a vocational expert who is prepared to "identify examples of appropriate jobs and to state the incidence of such jobs in the national economy." *See* R. 36 (Appeals Council Remand) (citing 20 C.F.R. § 404.1566).

So ordered.

John Gleeson, U.S.D.J.

Dated: August 30, 2007
      Brooklyn, New York